IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

| UNITED STATES OF AMERICA, | |
|---|---|
| Plaintiff, | No. CR12-0055 |
| vs. | REPORT AND RECOMMENDATION |
| GREGORY LATRELL GIVENS, | |
| Defendant. | |

## TABLE OF CONTENTS

I.   INTRODUCTION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.  PROCEDURAL HISTORY . . . . . . . . . . . . . . . . . . . . . . . . 2

III. RELEVANT FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
     A.   Vehicle Stop on October 7, 2010 . . . . . . . . . . . . . . . . . . 2
     B.   Search of Apartment on December 21, 2010 . . . . . . . . . . . . . 3

IV.  DISCUSSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
     A.   Was the Vehicle Stop Violative of the Fourth Amendment? . . . . . . 4
     B.   Was the Dog Sniff on December 21, 2010 an Unlawful Search? . . . . 9

V.   RECOMMENDATION  . . . . . . . . . . . . . . . . . . . . . . . . . . 12

## I. INTRODUCTION

On the 28th day of November 2012, this matter came on for hearing on the Motion to Suppress (docket number 14) filed by the Defendant on November 15, 2012. The Government was represented by Assistant United States Attorney Daniel C. Tvedt. Defendant Gregory Latrell Givens appeared personally and was represented by his attorney, Cory Goldensoph.

## II. PROCEDURAL HISTORY

On October 3, 2012, Defendant Gregory Latrell Givens was charged in an indictment with possession of ammunition as a felon (Count 1) and possession of crack cocaine with intent to distribute (Count 2). At his arraignment, Defendant entered a plea of not guilty and trial was scheduled before Chief Judge Linda R. Reade on December 17, 2012. Because of the pending motion, the trial has been continued to January 22, 2013.

On November 15, 2012, Defendant timely filed the instant motion to suppress. Defendant asks the Court to suppress any evidence obtained following a vehicle stop on October 7, 2010, and suppress any evidence obtained during a search of an apartment on December 21, 2010.

## III. RELEVANT FACTS

Defendant is charged in two counts. Count 1 concerns 50 rounds of 9mm ammunition found in a vehicle being operated by Defendant – who is a convicted felon – on October 7, 2010. Count 2 arises from the discovery of crack cocaine in an apartment on December 21, 2010. Briefly stated, the underlying facts are these:

### A. Vehicle Stop on October 7, 2010

At approximately 2:00 a.m. on October 7, 2010, Officer Nathan Baughan of the Cedar Rapids Police Department was on routine patrol. While stopped at a stop sign on 14th Street, Baughan observed a car being driven by Defendant pass in front of him on Mount Vernon Road. Baughan noticed that the vehicle did not have metal license plates. Baughan could see what appeared to be a paper registration in the upper lefthand corner of the rear window. Baughan testified, however, that because of the "angle" of the window and the lighting circumstances, he "couldn't read it."

According to Officer Baughan, he has had experience with "lots" of fraudulent paper registrations. Baughan testified that some paper registrations displayed on vehicles are fake, fraudulently issued, altered, or out of date. Because he was unable to read the information displayed on Defendant's vehicle, Baughan decided to conduct a traffic stop

2

to determine its validity. Baughan conceded at the hearing that the paper registration was, in fact, valid and timely. A search of the vehicle yielded 9mm ammunition.

Defendant does not contest the validity of any actions taken by Officer Baughan *after* the vehicle was stopped. That is, the sole issue is whether the vehicle stop was constitutionally permitted. Defendant does *not* claim he was unlawfully ordered out of the vehicle, or that the subsequent search of the vehicle was unlawful. Accordingly, no evidence was offered in that regard and the Court need not concern itself with those details.

## B. Search of Apartment on December 21, 2010

On November 23, 2010, the Cedar Rapids Police Department Narcotics Division received a phone call at its "main narcotics phone line," referencing drug activity at an apartment building located on 1st Avenue SW. The unknown caller left a message saying that there was "drug dealing on all three floors of the apartment building."[1] The caller also reported that there was "a lot [of] traffic to the building at nighttime" and there "was an odor of marijuana in the hallways."[2] Approximately three weeks later, on December 16, another anonymous caller left a message on the "main narcotics line," stating that there was "drug activity" in the same apartment building.[3]

On December 19, 2010, at approximately 3:15 p.m., Officer Christopher Bieber, accompanied by his canine partner ("Jenks"), proceeded to the apartment building identified in the two anonymous phone messages.[4] Jenks is certified annually in the detection of controlled substances, and receives 16 hours of training monthly. Bieber

---

[1] *See* Application for Search Warrant, Attachment A (docket number 18-2 at 6).

[2] *Id.*

[3] *Id.*

[4] Photographs of the exterior of the apartment building were introduced as Government's Exhibits 3, 4, and 5.

3

"buzzed" one of the tenants, identified himself as a police officer, and was admitted to the building. According to Bieber, this is a "common way" for him to gain entrance to an apartment building.

After entering the building, Officer Bieber let Jenks "off leash" and walked each of the three floors.[5] Bieber testified that Jenks sniffed each of the apartment doors on each floor. Jenks "alerted" only at the door to apartment 3F. Based on that alert, Investigator Chip Joecken of the Cedar Rapids Police Department sought and obtained a state search warrant on December 21, 2010.[6] A search incident to the warrant discovered controlled substances in the apartment.

Defendant does not challenge the qualifications of Officer Bieber or Jenks. Similarly, Defendant does not contest the fact that Jenks alerted to the odor of a controlled substance at the door leading to apartment 3F. Furthermore, Defendant does not claim there are any defects in the search warrant application, or that the search warrant was not supported by probable cause. Rather, Defendant asserts that the information used to support probable cause – namely, the dog sniff – was unlawfully obtained.

## IV. DISCUSSION

### A. Was the Vehicle Stop Violative of the Fourth Amendment?

Givens first argues that Officer Baughan lacked reasonable suspicion to stop his vehicle during the early morning hours of October 7, 2010. The Fourth Amendment protects against unreasonable searches and seizures. A traffic stop constitutes a seizure of the vehicle's occupants. *United States v. Hollins*, 685 F.3d 703, 705 (8th Cir. 2012). Accordingly, a traffic stop "must be supported by reasonable suspicion or probable cause." *Id.* at 706. "Reasonable suspicion" exists when the officer is aware of "particularized,

---

[5] Photographs of the interior of the apartment building were introduced as Government's Exhibits 6 and 7.

[6] The search warrant application, together with attachments, and the search warrant were introduced as Government's Exhibit 2.

4

objective facts which, taken together with rational inferences from those facts, reasonably warrant suspicion that a crime is being committed." *Id.* (quoting *United States v. Houston*, 548 F.3d 1151, 1153 (8th Cir. 2008)). Moreover, any traffic violation, however minor, provides probable cause for a traffic stop. *Id.* Accordingly, the Court must determine whether the facts known to Baughan "viewed from the standpoint of an objectively reasonable police officer, amount to reasonable suspicion or to probable cause." *Ornelas v. United States*, 517 U.S. 690, 696 (1996).

Here, Officer Baughan credibly testified that the vehicle being driven by Defendant lacked metal license plates, and he was unable to read what appeared to be a paper registration due to the angle of the rear window and the lighting circumstances. In Iowa, registration plates issued for a motor vehicle must be attached to the front and rear of the vehicle. Iowa Code section 321.37(1). The plate must be positioned so that it is "clearly visible" and must be maintained to be "clearly legible." Section 321.38. A vehicle may be operated without registration plates, however, for a period of 45 days after delivery of the vehicle to a purchaser from a dealer "if a card bearing the words 'registration applied for' is attached to the rear of the vehicle." Section 321.25. The registration card must have the dealer's registration number "plainly stamped or stenciled," and must include the date the vehicle was delivered. *Id.* Operating a vehicle on the highway without displaying a valid registration card constitutes a simple misdemeanor. Section 321.98.

The parties cite three Eighth Circuit cases involving vehicle stops where a paper registration tag was displayed: *United States v. Mendoza*, 691 F.3d 954 (8th Cir. 2012), *United States v. Sanchez*, 572 F.3d 475 (8th Cir. 2009), and *United States v. Smart*, 393 F.3d 767 (8th Cir. 2005). The Court found no Constitutional violation in any of the three cases.

In *Smart*, a Des Moines, Iowa, police officer on routine patrol in the early morning hours observed an oncoming vehicle that was not displaying a front license plate. After turning his car around, the officer observed that it had a rear plate, but he could not

determine from his distance what state had issued that plate. 393 F.3d at 769. Because the failure to display a front license plate was a possible traffic violation – although Iowa permits out-of-state vehicles to display only one plate if it is registered in a state requiring only one license plate – the officer activated his emergency lights and stopped the car for an investigation. It was only after defendant's car had stopped and the officer approached it on foot that he noticed there was a Georgia plate on the rear of the car. *Id.* The district court found that the officer was laboring under a mistake of law, that such a mistake cannot provide the basis for a lawful stop, and granted defendant's motion to suppress. The Eighth Circuit reversed, concluding the officer "made neither a mistake of law nor one of fact" when he stopped the defendant's vehicle. *Id.*

The Court in *Smart* noted that the officer "could not discern" what state had issued the plate. "Thus, the officer simply had a suspicion, based on an imperfect and incomplete observation, that Mr. Smart might have been violating Iowa traffic laws." *Id.* at 770. The Court concluded that the officer's suspicions were sufficient to justify an investigatory stop.

> A law enforcement officer whose observations lead him or her reasonably to suspect that a particular person has been or is about to be engaged in criminal activity may stop that person to investigate the circumstances that provoke suspicion. (citations omitted) Accordingly, Officer Nicolino had an objectively reasonable basis to stop Mr. Smart's vehicle if he reasonably suspected that Mr. Smart was operating a vehicle that did not comply with Iowa traffic laws.

*Smart*, 393 F.3d at 770. Similarly, Officer Baughan could not read what appeared to be a paper registration in Defendant's rear window. At the least, a reasonable police officer could believe the registration card was not "clearly visible," and stop to investigate further.

The fact Defendant's registration card *may* have been valid, and was subsequently found to be valid, is of no consequence. It was discovered during the investigation in

6

*Smart* that no law violation occurred, but that did not defeat the reasonable suspicion which existed when the vehicle was stopped initially.

> Officer Nicolino's observations, although incomplete, were sufficient to give rise to a reasonable suspicion that Mr. Smart's vehicle was in violation of Iowa's license plate requirements. *The possibility that there was no violation, and the subsequent determination that there was not, does not mean that the initial suspicion was unreasonable.*

*Smart*, 393 F.3d at 770-71 (emphasis added).

In *Sanchez*, a Nebraska state trooper noticed an oncoming vehicle without a front license plate. As the vehicle passed him, the trooper saw that it was not displaying a rear license plate either. However, the trooper observed "a piece of paper affixed to the minivan where a rear license plate would have been displayed." 572 F.3d at 476. As the trooper pursued the minivan, he was able to read portions of the text. From his vantage point, however, the trooper could not read the words "Arizona Temporary Registration Plate" or otherwise discern the name of any issuing state. *Id.* at 477. Suspecting the paper was not an official document, the trooper decided to stop the minivan to investigate. In affirming the defendant's conviction, the Court concluded that "it was objectively reasonable for [the trooper] to suspect at the time of the stop that the paper affixed to the rear of the minivan was not an official registration document from another State." *Id.* at 478. The Court concluded that the words identifying the paper as an Arizona temporary registration plate "were too small to be read by a trooper observing the minivan on the highway," and therefore the trooper "had reasonable suspicion to believe that the minivan did not display valid proof of vehicle registration, as required by Nebraska law." *Id.* at 479. Here, Officer Baughan was unable to read the piece of paper located in Defendant's rear window, albeit for different reasons, thereby giving rise to a reasonable suspicion that Defendant was in violation of Iowa law.

In *Mendoza*, another Des Moines, Iowa, police officer on routine patrol was advised that agents from the Drug Enforcement Administration "wanted a marked unit of the police

7

department to stop a black Volvo sedan that was under surveillance." 691 F.3d at 956. The officer observed "what appeared to be a paper tag up in the left-hand corner of the rear window," and thought the tag "looked improper." *Id.* The district court found that the officer "credibly testified that she could not read the state of origin of the temporary tag," and denied the defendant's motion to suppress. *Id.* at 956-57. In affirming the conviction, the Eighth Circuit rejected the defendant's argument that *Sanchez* was distinguishable because the officer in *Mendoza* made no effort to check the registration tag as she approached the vehicle. Whether the officer makes a post-stop effort to inspect the tag "has no bearing on whether she had reasonable suspicion to make the traffic stop in the first place." *Id.* at 959.

Turning to the instant action, Defendant argues that *Smart*, *Sanchez*, and *Mendoza* are not controlling here, and instead urges the Court to follow the Fourth Circuit's holding in *United States v. Wilson*, 205 F.3d 720 (4th Cir. 2000). In that case, a temporary paper license tag was placed on a car recently purchased by the defendant. An officer noticed the temporary tag, but was unable to read the expiration date. "There was no evidence that the tag was concealed, improperly displayed, smudged, or faded by age." *Id.* at 722. In reversing the defendant's conviction, the Fourth Circuit concluded that "[t]he Fourth Amendment does not allow a policeman to stop a car just because it has temporary tags." *Id.* at 724. In *Mendoza*, however, the Eighth Circuit Court of Appeals distinguished *Wilson* by noting that the officer in *Mendoza* saw only "what appeared to be a paper tag" posted in the rear window, and the record did not establish the officer "knew the document was a legitimate temporary registration tag." 691 F.3d at 959. Similarly, Officer Baughan was unable to determine prior to stopping Defendant's vehicle – due to the angle of the window and lighting conditions – that the paper in the upper lefthand corner of the rear window was a valid registration tag. In *Wilson*, the officer could see that the car had a North Carolina temporary tag, but was unable to read the expiration date. In *Mendoza*,

the officer was unable to determine that it was, in fact, a temporary registration tag. The facts here align more closely with those in *Mendoza*.

In *Ornelas*, the Supreme Court cautioned that the standards for determining what constitutes "reasonable suspicion" and "probable cause" are "not readily, or even usefully, reduced to a neat set of legal rules." 517 U.S. at 696. "They are instead fluid concepts that take their substantive content from the particular contexts in which the standards are being assessed." *Id.* Here, Officer Baughan knew that the vehicle being operated by Defendant had no metal license plates. While he was able to observe a paper attached to the upper lefthand corner of the rear window, he credibly testified that he was unable to read it. That is, Baughan could not tell whether it was a valid temporary registration card. Iowa law requires that registration plates be clearly visible. Violation of the law constitutes a simple misdemeanor. Accordingly, I conclude that Officer Baughan had probable cause to believe a traffic violation had occurred. At the least, he had reasonable suspicion to investigate further. Accordingly, the vehicle stop on October 7, 2010 was not violative of the Fourth Amendment.

## B. Was the Dog Sniff on December 21, 2010 an Unlawful Search?

Givens next asks that the Court suppress evidence obtained during the execution of a search warrant on December 21, 2010. Givens does not claim any technical defect in the warrant, nor does he assert that the warrant is unsupported by probable cause. Instead, Givens argues that the information supporting probable cause – *i.e.*, an alert at the door of the apartment by a drug-sniffing dog – was unlawfully obtained. In other words, Givens asserts that the dog sniff itself was an unlawful warrantless search.

Defendant concedes, as he must, that the courts have routinely found that a dog sniff is not a search. *See, e.g., Illinois v. Caballes*, 543 U.S. 405 (2005) (finding that a dog sniff during a traffic stop was not violative of the Fourth Amendment). Defendant also recognizes that the Eighth Circuit has previously concluded that a canine sniff in the common corridor of a hotel does not intrude upon the occupant's legitimate expectation of

9

privacy, and therefore does not contravene the Fourth Amendment. *See United States v. Roby*, 122 F.3d 1120, 1124-25. Defendant advocates for a different result, however, when a dog sniff occurs at the door of a person's home, citing *Jardines v. Florida*, 73 So.3d 34 (Fla. 2011), *cert. granted*, 132 S. Ct. 995 (2012).[7]

In *Jardines*, officers received an unverified "crime stoppers" tip that the home of Joelis Jardines was being used to grow marijuana. One month later, acting on the tip and other information, two detectives approached the residence, accompanied by a drug detection dog. After the dog alerted to the scent of contraband, officers sought and obtained a search warrant for the home. The Florida Supreme Court concluded that the federal dog sniff cases were inapplicable at a private home because in addition to providing evidence of the existence of contraband – for which there is no legitimate privacy interest – the dog sniff may subject the occupant to an "untoward level of public opprobrium, humiliation or embarrassment." *Id.* at 45. Defendant asserts that a dog sniff in a common hallway of an apartment building more closely resembles the facts in *Jardines*, than a dog sniff in a common hallway of a hotel, which the Eighth Circuit found lawful in *Roby*. Accordingly, Defendant asks the Court to follow the Florida Supreme Court's ruling in *Jardines*.

At the time of hearing, Defendant's counsel candidly admitted that his research had not revealed the Eighth Circuit's recent holding in *United States v. Scott*, 610 F.3d 1009 (8th Cir. 2010). There, a confidential informant told Iowa City, Iowa police that the defendant was distributing crack cocaine out of an apartment in a specified apartment building. Acting on this tip, an officer took his drug detection dog into the common hallway of the building, and the dog alerted to the odor of narcotics at the front door of the defendant's apartment. Officers obtained a search warrant, which resulted in the discovery of crack cocaine and paraphernalia consistent with the sale of drugs. Scott

---

[7] According to Defendant's brief, the United States Supreme Court heard oral arguments on October 31, 2012.

argued, among other things, "that the use of a drug detection dog to sniff the doorframe of his apartment violated the Fourth Amendment." *Id.* at 1013. In affirming the defendant's conviction, the Court found its holding in *Roby* was indistinguishable. "While a person's privacy interests in a hotel room and in an apartment may differ, any such differences are immaterial here because Scott had no legitimate privacy interest in the illegal drugs that Naton's sniff detected." *Id.* at 1016 (internal citation omitted). The Court stated plainly that "Supreme Court and Eighth Circuit precedent support the conclusion that Naton's sniff of the apartment door frame from a common hallway did not constitute a search subject to the Fourth Amendment." *Id. See also United States v. Mendoza*, 281 F.3d 712, 715 (8th Cir. 2002) ("[W]e have repeatedly held that tenants of multifamily dwellings have no legitimate expectation of privacy in common or shared areas."). The facts in *Scott* are on all fours with the facts in the instant action, and I believe *Scott* is dispositive of this question.[8] The dog sniff used to establish probable cause to obtain a search warrant in this case did not constitute an unlawful warrantless search and, therefore, Defendant's argument in this regard fails.[9]

---

[8] While the tip in *Scott* came from a confidential informant, rather than two unknown callers, that fact is immaterial to whether a dog sniff at an apartment door in a common hallway is a warrantless search.

[9] In its brief, the Government also argues that even if the search warrant is invalid for any reason, the motion to suppress should still be denied as the officers acted in good faith in relying on the warrant, citing *United States v. Leon*, 468 U.S. 897 (1984). While I believe it is unnecessary for the Court to reach this issue, the good faith exception in *Leon* would preclude application of the exclusionary rule. None of the four exceptions – (1) submitting a false affidavit, (2) the judge abandoning his judicial role, (3) the affidavit "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable," or (4) a facial deficiency in the warrant – have been shown to be applicable. *United States v. Grant*, 490 F.3d 627, 632-33 (8th Cir. 2007).

## V. RECOMMENDATION

For the reasons set forth above, I respectfully recommend that Defendant's Motion to Suppress (docket number 14) be **DENIED**. The parties are advised, pursuant to 28 U.S.C. § 636(b)(1), that within fourteen (14) days after being served with a copy of this Report and Recommendation, any party may serve and file written objections with the district court. *The parties are reminded that pursuant to Local Rule 72.1, "[a] party asserting such objections must arrange promptly for a transcription of all portions of the record the district court judge will need to rule on the objections." Accordingly, if the parties are going to object to this Report and Recommendation, they must promptly order a transcript of the hearing held on November 28, 2012.*

DATED this 30th day of November, 2012.

_____
JON STUART SCOLES
CHIEF MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA